IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| United States of America, | ) | CR 16-00478-21-TUC-JGZ(LAB) |
| Plaintiff, | ) | **REPORT AND RECOMMENDATION** |
| vs. | ) | |
| Jorge Acosta-Licerio, | ) | |
| Defendant. | ) | |

The District Court referred this case to the Magistrate Judge for a hearing on the defendant's motion to suppress statements. The defendant, Jorge Acosta-Licerio, argues that all statements taken from him on 2/4/16, and evidence obtained as a result of those statements, must be suppressed because he was in custody and was not advised of his *Miranda* warnings, in violation of his Fifth Amendment rights. (Doc. 738).

An evidentiary hearing was held on 8/17/17. Special Agents Jason Red and Albert Gibes, and the defendant each testified. Government's Exhibit 3, recordings of the three interviews on 2/4/16, was admitted by stipulation. The Court listened to all of the interviews in chambers after the hearing.

**Charges:**

The defendant is charged in Counts 56, 57, 58 and 59 of an indictment, with two counts of smuggling goods from the United States, dealing firearms without a license, and conspiracy to attempt to export firearms and ammunition from the United States, in violation of 18 U.S.C. §§ 554(a), 922(a)(1)(A), 924(a)(1)(D), and 371.

**Motion to Suppress:**

The defendant argues that his Fifth Amendment rights were violated when Special Agents Red and Gibes knocked on his front door on 2/4/16 and asked to speak with him. The first part of the questioning took place at Mr. Acosta-Licerio's kitchen table. The agents then asked if they could speak with him outside. The questions continued in the driveway. The last part of the interview occurred in the agent's car with the defendant in the passenger seat, an agent in the driver's seat, and an agent in the back seat. Additional interviews took place later that evening when Mr. Acosta-Licerio met the agents in a parking lot to retrieve his cell phone. They agents then followed the defendant back to his house to seize four firearms that Mr. Acosta-Licerio was in the process of selling. The final interview took place back at the defendant's home.

Mr. Acosta-Licerio argues that he was in custody, was not free to leave, and was not advised of his *Miranda* rights. The government responds that Mr. Acosta-Licerio was not in custody, based on the totality of the circumstances. It acknowledges that no *Miranda* warnings were given because the interrogation was not custodial.

The Court concludes that Mr. Acosta-Licerio was not in custody. The circumstances of the questioning did not require *Miranda* warnings. The defendant did not raise a voluntariness issue, but the facts would not support such argument. The statements, and any evidence stemming from the statements, are admissible at trial.

**EVIDENCE:**

*Jason Red*

Jason Red has been a Special Agent (SA) with Homeland Security Investigations (HSI) for over 13 years. Prior to that, he was a U.S. Border Patrol Agent for 1 ½ years. Before the interviews of Jorge Acosta-Licerio on 2/4/16, SA Red was involved in an investigation of an organization that was trafficking weapons and ammunition from Arizona to Mexico. Approximately 20 people had been identified as part of the conspiracy. In early January of 2016, 10,000 rounds of ammunition and 10 AK 47 rifles were seized. A trace of the weapons led the agents to associate the defendant with 3 of the firearms. They also determined that he was buying and selling guns without a license.

Mr. Acosta-Licerio was not the focus of the investigation when he was first contacted. He was not a suspect. The agents had no arrest warrant and no probable cause to arrest him. He was a person of interest. Not all persons of interest became defendants in this case. The agents had no intention of arresting Mr. Acosta-Licerio and did not arrest him after the interviews.

Agents Red and Gibes knocked on the defendant's door. There were no other agents present. They arrived in a small, unmarked SUV, wearing plain clothes with neck badges. They were armed but their weapons were never visible. Mr. Acosta-Licerio answered the door armed. The agents asked him to remove his weapon, which he did. He was very polite and invited the agents in to sit at his kitchen table in the great room. Mr. Acosta-Licerio's wife and young child were in the same area in front of the television.

Agent Red testified that the interview began with some small talk about being in the military. Mr. Acosta-Licerio seemed a little nervous which was understandable because two federal agents showed up at his door unannounced. Even so, the defendant did not hesitate to answer questions. When Agent Gibes took the lead and began asking about the firearms, the defendant became a little more nervous but answered all questions. He gave

a lot of detail. During the questions at the kitchen table, the agents believed that the defendant was not being truthful. He was looking toward his family as if he didn't want them to hear what he was saying. He gave no indication that he wanted the agents to leave or that he wanted to stop talking.

About 31 minutes into the interview, the recording confirms that Agent Red asked Mr. Acosta-Licerio to step outside, in an effort to speak with the defendant away from his wife. The defendant hesitated but agreed. The three men continued their conversation in the driveway, with the defendant closest to his house. The agents were blocking his exit from the property. Agent Gibes confronted Mr. Acosta-Licerio with his lack of candor, explained that lying is a federal offense and that continued lies could cause problems. The defendant admitted being dishonest. The agents did not tell him he had to speak with them. They did not threaten him. The defendant said he wanted to be truthful and spoke freely. The recording indicates that the agents offered Mr. Acosta-Licerio the option of speaking outside or in front of his wife, which could mean she might later be called to testify.

The agents told Mr. Acosta-Licerio that if he cooperated, and because he was "being cool," they had no intention of arresting him that day. Several times during the interviews, Mr. Acosta-Licerio told the agents that he had to go to school. About 21 minutes into the recording, Agent Red said, "I know you have school right now but this is really important." The defendant answered that he knew and wanted to help but was short on time. At about 35 minutes, they told him he would have to call school off because this is too important to delay. They offered to call the school, telling him he had to talk "right here, right now." After a short time the agents said it might be more comfortable to sit in their vehicle to finish the interview. Mr. Acosta-Licerio went back into the house to tell his wife he would be outside and then let himself into the passenger front seat of the agents' vehicle.

Agent Red sat in the driver's seat. Agent Gibes sat in the back. The defendant was comfortable, seemed relieved, less nervous, had no hesitation and gave a lot of detail. During the interview the agents developed a belief that the defendant was involved in criminal activity. They told Mr. Acosta-Licerio that what he was telling them was a crime and that he might be charged at a later time. They told the defendant that if he did not lie he would not go to jail but they might come back for him another time. They did not threaten him or threaten to arrest him. The conversation was at all times friendly. When the interview ended the defendant went into his home and the agents left. With the defendant's consent, the agents took Mr. Acosta-Licerio's cell phone so they could retrieve information from it. Mr. Acosta-Licerio made suggestions about information the agents might be interested in. They all agreed to meet when his final exam was over to return the phone.

The agents met with Mr. Acosta-Licerio at the agreed upon time and place. They returned the phone and told the defendant that they needed to confiscate the four AK 47 rifles that were intended for criminal activity. Mr. Acosta-Licerio continued to freely provide detailed information until one of the agents said it was getting late and they needed to follow him back to his home to retrieve the firearms. Mr. Acosta-Licerio helped the agents locate some messages on his phone.

Once at the house, the agents clarified which weapons were for sale and which belonged to the defendant. They were careful not to take anything that belonged to Mr. Acosta-Licerio. They said that the defendant might get the guns back later but that was unlikely. They made some small talk about dogs, the military, guns, and Mr. Acosta-Licerio's medical condition. By the end of the interviews, the agents had developed probable cause to arrest Mr. Acosta-Licerio, but they did not arrest him.

The Court notes that in listening to over 3 hours of recorded interviews, Mr. Acosta-Licerio did most of the talking. They agents asked very few questions. They

tried to end the interviews a number of times but the defendant continued to talk. He spoke in a familiar manner, using profanity, and at times, laughing and joking. Mr. Acosta-Licerio was never advised of his *Miranda* rights.

### ***Jorge Acosta-Licerio***

Jorge Acosta-Licerio testified that he did not remember exactly what happened on 2/4/16 until he listened to the recorded statements the morning of the motion hearing. He had never seen the agents before they arrived at his home. He had just returned from military duty and did not know anyone in Tucson. That's why he answered the door armed.

The agents said they had a few questions. The defendant asked if it was about his .50 (50 caliber rifle) but the agents said they were there about something else. Mr. Acosta-Licerio said they could come in. They all sat at the kitchen table. The agents were friendly and polite. They made small talk about being veterans. When the agents asked about the photograph of the AKs, their tone changed and they focused on the defendant lying. At about 30 minutes and 50 seconds on the recorded statement, SA Gibes became more aggressive and the defendant felt cornered. It was obvious the agents already had a lot of information.

Mr. Acosta-Licerio testified that the agents said they wanted to move the conversation somewhere else. They went out to the front porch. Mr. Acosta-Licerio was in front of the door with the agents blocking his way out. They told him they knew he was lying and to come clean. The defendant said he would be honest. The agents asked if Mr. Acosta-Licerio wanted to speak inside or outside but said the conversation was about to become uncomfortable and it would be better not to speak in front of his wife. Mr. Acosta-Licerio's wife cried when he told her he was going outside with the agents. He knew that stepping outside meant something bad.

The agents told Mr. Acosta-Licerio that they did not intend to arrest him because he was

"being cool" but if he kept lying….. Mr. Acosta-Licerio interrupted, saying he would not lie anymore. Even though the agent did not finish his sentence, the defendant testified that he believed the agent was about to say that if the defendant kept lying he would be arrested. He felt threatened with arrest. He was told that if he didn't lie he wouldn't go to jail, so the defendant told the agents everything. Once Mr. Acosta-Licerio started telling the truth, Agent Gibes became friendlier and settled down.

At about 34 ½ minutes into the recording, the agents told Mr. Acosta-Licerio that he needed to call in to school because this is more important and needs to happen right here, right now. Mr. Acosta-Licerio thought he was not going anywhere and was not going to be allowed to go to school to take his final exam, although he didn't tell them he had a final until later.

While speaking to the agents in their car, Mr. Acosta-Licerio received a phone call from a suspect in the case. He did not answer the first call, but after discussing it with the agents, he picked up the second call and had a conversation in Spanish about firearms. The agents received consent from the defendant to take his phone while he went to take his final. They would extract the information from the phone and then return it after the final was finished. Mr. Acosta-Licerio agreed and told the agents where and what time to meet him. He testified that he knew that if he didn't continue to cooperate he would be arrested.

Mr. Acosta-Licerio met the agents after class and retrieved his phone. He felt he had no choice but to speak with the agents. He knew if he lied it would look worse for him later. Also, thinking of his family compelled him to tell the truth. He testified that never asked the agents to leave. He didn't tell them he didn't want to answer their questions. He never tried to go back into his house. He could have gotten out of the car, but didn't. Mr. Acosta-Licerio asked to leave to take his final, and he did go although he was late.

The agents told Mr. Acosta-Licerio that they could probably help him get probation. Emotionally, the defendant felt he had no choice but to answer questions. He cooperated

with the agents because he was afraid he would go to jail, he wanted the best outcome for himself and his family and he did not want to get arrested in front of his family. He was never advised of his rights. He was never told he was free to leave or that he didn't have to talk.

**DISCUSSION**:

When a person is taken into custody, or otherwise deprived of freedom of action in a significant way, and questioned by law enforcement officers, he must be first "warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney..." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). "[A]n officer's obligation to administer *Miranda* warnings attaches only where there has been such a restriction on a person's freedom as to render him in custody." *Dyer v. Hornbeck*, 706 F.3d 1134, 1138 (9th Cir. 2013) (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994)) (punctuation modified). The totality of the circumstances surrounding the interrogation must be examined by the court, but ultimately the inquiry is whether there was a formal arrest or the defendant's restraint of freedom of movement was "of the degree associated with a formal arrest." *Stansbury*, *Id*.

The initial inquiry in determining custody is whether, under the circumstances, a reasonable person would have felt free to terminate the interrogation and leave. *U.S. v. Barnes*, 713 F.3d 1200, 1204 (9th Cir. 2013). Reasonableness is an objective standard. *U.S. v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002). The Court must also consider the circumstances surrounding the interrogation. The relevant factors the court considers when deciding if an interrogation was custodial "include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." *Howes v. Fields*, 132 S.Ct. 1181, 1189 (2013) (citations omitted).

In the present case, the interview began at the defendant's home after he invited the

agents to come in and sit at his kitchen table. The defendant's wife and young child were nearby, in front of the television. The interview moved to the front porch and then to the agents' unmarked car parked in front of the defendant's home. The next contact was several hours later in a parking lot near the defendant's school. The defendant chose the time and place. He arrived voluntarily to retrieve his phone. Finally, the agents followed the defendant back to his house to retrieve four firearms. The defendant drove his own car.

There were two agents in plain clothes with no weapons visible. At all times the conversation was friendly and polite. Although the first interview was lengthy, over two hours, that was in large part because the defendant talked so much. Only a small percentage of the conversation was initiated by the agents. The recorded interviews give no hint of nervousness or hesitation on the defendant's part.

Mr. Acosta-Licerio was assured several times that he was not going to be arrested that day as long as he told the truth. He was never restrained. His movement was never restricted. After each of the encounters, Mr. Acosta-Licerio was released and was free to leave. He was not arrested.

Although a reasonable person might have been nervous when two federal agents showed up unannounced and began questioning him about criminal activity, the agents did nothing more than that. A reasonable person might also decide to speak to the agents to try to curry favor. However, under the totality of the circumstances of this case, a reasonable person would feel free to refuse to speak with the agents, refuse to invite them into his home and would feel free to leave and go take his final exam. The latter is what the defendant did. He was not in custody. The agents had no obligation to advise Mr. Acosta-Licerio of his *Miranda* rights. They did nothing to coerce him to speak to them or to overbear his will. The statements were given voluntarily.

**RECCOMMENDATION**:

In view of the foregoing, it is recommended that, after its independent review of the record, the District Court **DENY** the motion to suppress statements. (Doc. 738)

Defense counsel may serve and file written objections within 14 days. If objections are not timely filed, the party's right to de novo review may be waived. No reply to objections shall be filed unless leave is granted from the District Court.

The Clerk of the Court is directed to send a copy of this Report and Recommendation to all parties.

DATED this 23rd day of August, 2017.

_Leslie A. Bowman_
Leslie A. Bowman
United States Magistrate Judge